# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Estate of | No. 49867-7-II |
| ELMA J. KANGAS, | |
| Deceased. | |
| DALE KANGAS, | |
| Appellant, | |
| v. | |
| RICHARD KANGAS, Personal Representative of the Estate of Elma J. Kangas, | UNPUBLISHED OPINION |
| Respondent. | |

JOHANSON, J. — Dale Kangas challenges the trial court order awarding Richard Kangas, the personal representative (PR) to the Estate of Elma Kangas, $60,000 in personal representative and professional services fees. Dale[1] argues that the fees awarded to Richard, more than 20 years after the creation of the estate, were improper because (1) the trial court erred when it refused to consider Richard's failure to properly execute his role as the personal representative of Elma's estate before the date of certain settlement agreements, (2) even if the trial court correctly refused to consider Richard's actions before the settlement agreement, Richard's actions in the following

---

[1] Because several of the individuals involved in this matter share the same last name, we refer to them by their first names for clarity. We mean no disrespect.

years justified a reduced award, and (3) Richard failed to adequately support his fee requests. We affirm.

FACTS

### I. THE ESTATES

Richard and John Kangas were the only children of Wayne and Elma Kangas. Elma died in December 1994. Her will directed that her estate be structured to avoid paying federal estate tax and to protect Wayne's "taxable estate" and that it also create a trust for Wayne, during his lifetime, that would then go to Richard and John.

The original petition for probate in Elma's estate was filed in March 1995. Elma's will nominated Wayne or John as the PR of her estate, but they declined to serve. Instead, they nominated Richard to serve as PR of Elma's estate. Richard was appointed PR of Elma's estate in March 1995.

Wayne died in January 1998, and his will was admitted to probate the same month. At the time of Wayne's death, "the ownership interest listed on Elma's federal estate tax return as funding the marital deduction and credit shelter trust had not been transferred." Clerk's Papers (CP) at 5. Wayne's granddaughter, Tammi Kangas-Van de Laarschot, was appointed PR of Wayne's estate. Tammi and her mother, Donna Kangas (Richard's estranged wife), were Wayne's heirs.

### II. OCTOBER 2008 SETTLEMENT AGREEMENT

In October 2008, Richard (individually and as PR of Elma's estate), John, Tammi (individually and as PR of Wayne's estate), and Donna entered into a settlement agreement related to both Elma's and Wayne's estates. One of the provisions of the October 2008 settlement

agreement awarded Elma's estate "all of the merchantable timber as of October 1, 2008" on certain property. CP at 26.

The agreement further provided, in part,

> The above merchantable timber ownership shall be evidenced by a timber deed or other equivalent document *requiring that the timber be harvested within five (5) years after the date the deed is signed and recorded*, subject to a two (2) year extension upon payment of $1,000 per month.

CP at 26 (emphasis added).

### III. FEBRUARY 2009 SETTLEMENT AGREEMENT

In February 2009, John (in his individual capacity as remainder beneficiary of Elma's trust) and Richard (as PR of Elma's estate and trustee of the trust created in Elma's will) entered into a second settlement agreement. This settlement agreement memorialized that Wayne's estate's, Tammi's, and Donna's interests in Elma's will had been resolved by the October 2008 settlement agreement and that John and Richard were the only remaining beneficiaries of Elma's estate or the trust.

The February 2009 agreement also addressed Richard's PR fees. It stated that Richard had been the PR of Elma's estate since March 31, 1995, that he had provided a variety of services to the estate, and that his "claim for reasonable fees for his services and expense reimbursement is reserved." CP at 7.

The agreement further provided,

> The undersigned Remainder Beneficiaries [Richard and John] waive any further or future accounting for the period or periods from December 6, 1994, the Decedent's date of death, through November 30, 2008, *and consent and approve of all acts of Richard as [PR] of [Elma's estate] and as trustee of the trust under Elma's Will, to the date hereof.*

CP at 8 (emphasis added).

The February 2009 settlement agreement also included the following "release" provision:

Except as provided for herein, Richard hereby releases and discharges any and all claims, loss, liability, accounting or damage, whether known or unknown, he may have against John, to date, regarding management and administration of Decedent's Estate and Wayne's Estate. *Except as provided for herein, John hereby releases and discharges any and all claims, loss, liability, accounting, or damage, whether known or unknown, he may have against Richard, individually or in his capacity as [PR] of the Decedent's Estate, to date, regarding management and administration of the Decedent's Estate and Wayne's Estate. Except as provided herein, this mutual and reciprocal release and discharge is a full, complete, and general release to date regarding management and administration of the Decedent's Estate and Wayne's Estate.*

CP at 9-10 (emphasis added).

IV. JOHN'S PETITION TO CLOSE ESTATE; JOHN'S DEATH

The remaining estate asset, timber discussed in the October 2008 settlement agreement, was harvested in 2013. In June 2014, John moved the trial court for "an order directing the [PR] to close" Elma's estate no later than July 15, 2014. CP at 18.

John alleged that all of the assets had been liquidated and that the estate was ready to be closed. John further alleged that Richard had waited until the last moment to harvest the timber referenced in the October 2008 settlement agreement and that the payments for this timber were received as of November 14, 2013. Although John alleged that Richard had breached his fiduciary duty and could possibly be removed as PR, John emphasized that all he was seeking was an order requiring a final accounting so the estate could be closed.[2]

---

[2] It is unclear from the record what happened to John's motion.

John died in November 2015, before the full distribution from Elma's estate was made. John's son Dale was the PR of John's estate.

V. PETITION TO CLOSE ESTATE AND APPROVE FEES

A. RICHARD'S MOTION

On September 2, 2016, Richard filed a petition to close Elma's estate and approve PR and professional fees. He requested $30,000 in PR fees and $30,000 for his work as "a forest manager/consultant" for the estate. CP at 54. Richard noted his personal involvement in the timber sales and claimed that he had spent "at least 4,000 hours over 20 years on the Decedent's Estate." CP at 54.

In support of this motion, Richard included an affidavit from Gordon Pogorelc, the owner of a logging company. Pogorelc (1) described Richard's knowledge of "forest products resource business," (2) stated that he (Pogorelc) had been in "an ongoing dialogue with [Richard] about harvesting timber . . . since at least 2006," (3) described the 2013 logging contract Richard entered into and explained that he (Pogorelc) had frequent contact, often daily, with Richard regarding the harvesting project, and (4) opined that it took more than the usual time to move forward with the timber harvest project because of the "[m]ore than usual amount of time . . . spent with the landowner, through Tammie . . ., to obtain her signature on the Forest Practices Application (cutting permit)." CP at 93.

Pogorelc also elaborated on Richard's involvement in administering the logging contract. Pogorelc estimated that he and Richard alone "spent at least forty hours in discussions/negotiations/management" related to the contract. CP at 93. Pogorelc also stated that Richard performed the reforestation obligation under the terms of the timber deed, "which included

5

ordering the correct grade seedling and hiring/supervising independent contractors to plant the seedlings." CP at 94. Pogorelc concluded that "Richard's services to the Estate in the 2013 harvest, including contract administration, if performed by a forester, would cost at least $30,000.00 plus costs" and that "Richard was competent to provide those services and conducted himself in a timely professional manner." CP at 94.

Pogorelc further stated that it was his opinion that "Richard sold the timber at the optimum time" and that, at the time of the sale, the market was at the highest it had been for more than six years. CP at 93. Pogorelc estimated that "[t]he value of the merchantable timber subject of the Logging Contract was at least twice the value it was in the fall of 2008, the date the . . . Timber Deed was signed." CP at 93.

## B. DALE'S OBJECTION

Dale, as PR of John's estate, objected to Richard's fee request. Dale alleged that Richard had obstructed the administration of Elma's estate and had unreasonably extended the time it took to close the estate for more than 21 years by intentionally disregarding his legal responsibilities and obligations as the estate's PR. Dale also asserted that Richard had not offered sufficient support for his requested fees and had failed to provide evidence that he was the forestry manager.

## C. RICHARD'S MOTION TO STRIKE AND REPLY

Richard subsequently moved to strike portions of Dale's objection. Richard asked the trial court "to strike and exclude all testimony of any breach of duty, delays in resolving estate disputes and ownership or other testimony except which may be consistent with" the February 2009 settlement agreement. CP at 202.

Richard also filed a reply to Dale's objection. In this reply, Richard described the complex nature of the activities related to the estate; argued that the settlement agreements precluded Dale from complaining about any acts, including the costs of administration, that predated the settlement agreements; and asserted that the delay of the timber sale until 2013 was to allow the log market to recover and resulted in obtaining a better price for the timber.

### D. RICHARD'S SUPPLEMENTAL SUPPORT FOR FEES

Following a September 30, 2016 hearing, during which the trial court apparently ruled that Richard was entitled to reasonable fees for his service, Richard provided the court with two supplemental affidavits supporting his fee requests—one from himself and one from Michael Alexander, a bank vice president and trust officer. Richard's affidavit included a list of the activities he had engaged in between January 13, 1995 and August 25, 2016, and some handwritten notes regarding some activities. Neither the list nor the notes included the amount of time spent on these activities or any specific details. Richard also asserted that his wage at his job with Weyerhaeuser, including fringe benefits and overhead, was $45 an hour.

In his affidavit, Alexander stated that his bank regularly provided probate services. Alexander stated that the federal estate tax return for Elma indicated that there were marital community assets of over $1.6 million, $600,000 of which was to be placed in a credit shelter trust. He estimated that had the bank managed Elma's estate, it would have charged at least $6,000 annually, plus an annual base fee and charges for any extra services. Including annual fees and extra services, the bank would have charged a minimum of $151,750 in PR fees if it had managed the estate for 21 years.

After Richard submitted the supplemental affidavits, Dale renewed his request that the trial court deny Richard's fee request. Dale contended that the information Richard had provided was insufficient to support his request because it was a mere "laundry list of one line entries, lacking virtually any detail for the Court to consider." CP at 173. Dale asserted that, based on his own calculations of how long the listed tasks would have taken and assuming the $45-per-hour rate was appropriate, Richard could justify an award of, at most, $7,700.

### E. Trial Court's Orders

On October 25, 2016, the trial court granted Richard's request for fees. But the court deferred ruling on the amount subject to another hearing.

The trial court granted Richard's motion to exclude "all testimony of any breach of duty and/or delay in resolving estate disputes and ownership through February 24, 2009," based on the settlement agreements. CP at 180. The trial court further ordered that Richard was entitled to reasonable fees for his PR and forestry consultant services undiminished or reduced by any claims that the PR failed to discharge his duties.

On November 16, 2016, the trial court issued an order granting Richard's fee request, approving the final report, authorizing distributions, and closing the estate. The trial court issued the following findings:

> 3. The fees of the [PR], to include forestry consultant services, and paid in the amount of $60,000, are reasonable and approved;
> 4. The acts of the [PR] are approved.

CP at 183.

Dale appeals the October 25 and November 16 orders.

ANALYSIS

I. REAL PARTY IN INTEREST AND STANDING

As a preliminary matter, Richard argues that we should dismiss this appeal because the real party in interest, John, has died and no one has moved to substitute his estate, or anyone else, in this matter.[3] Richard cites no law and presents no relevant argument supporting his assertions that there is no real party in interest and that Dale and his counsel have no standing. Accordingly, we decline to address this issue further and we reach the substantive issue raised in this appeal. RAP 10.3(a)(6); *Joy v. Dep't of Labor & Indus.*, 170 Wn. App. 614, 629, 285 P.3d 187 (2012) (Court of Appeals does not consider conclusory arguments that are unsupported by citation to authority).

II. PROFESSIONAL AND PR FEES

Dale argues that the professional and PR fees award to Richard were improper because (1) the trial court erred when it refused to consider facts relevant to whether Richard properly executed his PR responsibilities before the settlement agreements, (2) even if the trial court properly refused to consider Richard's action before the settlement agreements, Richard's actions in the following years justified a reduced award, and (3) Richard failed to adequately support his requests. Dale also argues that the trial court erred by not holding a "full factual hearing" addressing the delay following the settlement agreements. Br. of Appellant at 13 (alterations omitted). These arguments fail.

---

[3] We note that there is nothing in our record suggesting that Richard objected to Dale's or Dale's counsel's involvement in this case in the trial court.

A. Legal Principles

Personal representatives should be justly and reasonably compensated for their services. RCW 11.48.210.[4] In probate matters, we review a trial court's fee determinations for abuse of discretion. *In re Douglas' Estate*, 65 Wn.2d 495, 504, 398 P.2d 7 (1965); *In re Peterson's Estate*, 12 Wn.2d 686, 728, 123 P.2d 733 (1942); *see also In re Estate of Larson*, 103 Wn.2d 517, 521, 694 P.2d 1051 (1985). "Abuse of discretion occurs when the trial court's decision rests on untenable grounds or untenable reasons." *In re Estate of Peterson*, 102 Wn. App. 456, 462, 9 P.3d 845 (2000).

B. Effect of Settlement Agreements

Dale initially argues that the trial court erred when it refused to consider his allegations that Richard failed to properly execute his PR duties before the February 24, 2009 settlement agreement. Dale contends that, "[a]s a matter of public policy," the parties could not agree to waive issues related to Richard's fiduciary duties. Br. of Appellant at 9 (emphasis omitted).[5] Dale's public policy argument is not persuasive.

---

[4] RCW 11.48.210 provides in part,
> The [PR], when no compensation is provided in the will, . . . shall be allowed such compensation for his or her services as the court shall deem just and reasonable. Additional compensation may be allowed for his or her services as attorney and for other services not required of a [PR]. . . . If the court finds that the [PR] has failed to discharge his or her duties as such in any respect, it may deny him or her any compensation whatsoever or may reduce the compensation which would otherwise be allowed.

[5] For purposes of this opinion, we presume, but do not decide that Dale properly preserved this argument.

Dale's arguments about the effect of the settlement agreements largely focus on the inability of the parties to contract away or otherwise eliminate a PR's fiduciary duties. He cites to ERISA[6] cases and an Arizona statute[7] to support this argument.[8] But these cases and the Arizona statute address the ability of parties to contract away or eliminate fiduciary duties or the ability of a party to contract away or eliminate fiduciary duties owed to an entity other than themselves. *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 593-94 (3d Cir. 2009) (ERISA provision prohibiting waivers of fiduciary duties does not prohibit individual agreements that settle individual disputes without altering the fiduciary's statutory duties and responsibilities); *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 75 (S.D.N.Y. 2006) (addressing an individual's release in a defined contribution retirement plan, holding that individuals do not have authority to release a plan's right to recover for breaches of fiduciary duty); ARIZ. REV. STAT. § 29-1003 (parties to partnership agreements are prohibited from eliminating the fiduciary duties of the partners in the partnership contract).

Here, in contrast, the parties did not contract away or eliminate Richard's fiduciary duties or attempt to alter Richard's fiduciary duties to another person or entity—they merely entered into settlement agreements that resolved disputes regarding Richard's execution of his duties during a

---

[6] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, et seq.

[7] ARIZ. REV. STAT. § 29-1003.

[8] Dale also cites to *In re Matter of Bruan*, 35 Misc. 3d 345, 349-50, 938 N.Y.S.2d 762 (2012), which mentions that a fiduciary duty to account is not waivable. *Bruan* addresses a decedent's failure to comply with a prenuptial agreement to make a will that would create trusts for family members. 35 Misc. 3d at 346-47. It is unclear how this case relates to Dale's public policy argument.

specific time period.[9] Dale's argument fails to recognize this distinction. Accordingly, these cases and the Arizona statute do not support Dale's public policy argument.

Dale also argues that, as a matter of public policy, an individual cannot benefit from his or her own wrongdoings. Again, the trial court here relied on the settlement of a dispute between the parties, and Dale does not show how this amounts to Richard benefitting from his own wrongdoings.

Dale also cites *Hesthagen v. Harby*, 78 Wn.2d 934, 481 P.2d 438 (1971), arguing that if an administrator's actions can be characterized as misfeasance or mismanagement, the administrator should not be entitled to fees. But *Hesthagen* does not address the effect of a settlement agreement such as the one we have here.

The February 24, 2009 settlement agreement was not a waiver of fiduciary duty or any obligations to the estate. It was, instead, an agreement between the parties settling a disagreement, including disputes about, among other things, Richard's execution of his PR responsibilities up to the date of the agreement. Dale fails to persuade us that allowing the trial court to later rely on such settlement agreements should be against public policy. Thus, Dale does not establish that the trial court erred in relying on the settlement agreement and refusing to consider Richard's actions before February 24, 2009 when awarding fees.

---

[9] In fact, in his reply, Dale expressly acknowledges that the settlement agreement did not "abrogate Richard's fiduciary duties prospectively and for all time." Reply Br. of Appellant at 4 (emphasis omitted).

### C. POST-FEBRUARY 24, 2009 ACTIONS

Dale further argues that even if we hold that the trial court did not err in refusing to consider the presettlement agreement facts, the award should be reduced based on Richard's subsequent actions. Citing to the trial court's October 25, 2016 order, Dale appears to argue that the trial court did not consider Richard's actions after February 2009.

Although the trial court's October 25, 2016 order establishes that the trial court concluded Richard was entitled to fees, nothing in the order or in any other part of the record before us suggests that the trial court refused to consider Richard's postsettlement agreement behavior when determining whether the fee award was proper.[10] Accordingly, this argument fails.

### D. FEES AND OTHER COMPENSATION AWARDED

Dale next argues that the trial court's $60,000 award was not supported by the evidence. Dale challenges both the award for Richard's forestry management services and the award for his PR services. We hold that the trial court did not abuse its discretion in making either of these awards.

1. LEGAL PRINCIPLES

The PR of an estate "shall be allowed all necessary expenses in the care, management, and settlement of the estate." RCW 11.48.050. Again, we review the trial court's decision to award fees for abuse of discretion. *Douglas' Estate*, 65 Wn.2d at 504.

> The [PR], when no compensation is provided in the will, . . . shall be allowed such compensation for his or her services as the court shall deem just and reasonable. Additional compensation may be allowed for his or her services as attorney and for other services not required of a [PR].

---

[10] We note that the record before us does not contain the transcripts from any hearings.

RCW 11.48.210. A PR shall be allowed all necessary expenses in the care, management, and settlement of the estate. RCW 11.48.050. If the trial court finds that the PR has failed to discharge his duties in any respect, it may reduce the compensation that would otherwise be allowed. RCW 11.48.210.

"'With respect to allowances for services of personal representatives . . . , we have said that each case must stand upon its own footing, the general rule being that this court will not interfere with the trial court's discretion nor disturb its findings unless there are facts and circumstances clearly showing an abuse of discretion.'" *In re Belknap's Estate*, 12 Wn.2d 643, 665-66, 123 P.2d 358 (1942) (quoting *In re Fetterman's Estate*, 183 Wash. 410, 413, 48 P.2d 638 (1935)). "It would be impossible, of course, to embody in an opinion a recital of the various and minute transactions, more or less routine, involved in the administration of an estate like the one before us." *Fetterman's Estate*, 183 Wash. at 413. In light of this, courts examine more general factors, such as (1) the size of the estate, (2) the nature of the services rendered, and (3) whether there was substantial litigation or "difficult problems to solve or controversies to adjust" when determining the reasonableness of PR fees. *Fetterman's Estate*, 183 Wash. at 413.

2. FORESTRY MANAGEMENT FEES AWARD

Dale argues that the trial court should not have compensated Richard for his forestry management services. Without citing to any authority, Dale argues that for Richard to be entitled to any professional fees, he had to show that (1) he was qualified to do the work, (2) the work was necessary, (3) the work was performed in an efficient and reasonable manner, and (4) the proposed

compensation reflects the current market rate.[11]  For purposes of this appeal, we will presume this is the correct standard.  Even so, Dale's arguments fail.

Richard supported his claim for professional fees with Pogorelc's affidavit.  Notably, Dale did not present any affidavits or evidence or otherwise challenging Pogorelc's affidavit.

Pogorelc's affidavit provided a basis upon which the trial court could find that Richard had specific expertise in the forestry industry and was qualified to do the work in question.  Pogorelc specifically stated that "Richard was competent to provide those services and conducted himself in a timely professional manner," CP at 94, and described Richard's knowledge of the "forest products resource business."  CP at 93.

Pogorelc's affidavit also supports the conclusion that the work was necessary.  Pogorelc stated that if a professional forester had taken on the same work, it would have cost the estate at least $30,000.  Furthermore, these activities were clearly related to Richard's obligation under the October 2008 agreement to sell the timber for the benefit of the estate.  Pogorelc's affidavit also provided a basis upon which the trial court could conclude that the work was performed in an efficient and reasonable manner and that the compensation was at or less than the market rate because Pogorelc stated that "Richard's services to the Estate in the 2013 harvest, including contract administration, if performed by a forester, would cost at least $30,000 plus costs" and that the work was "conducted . . . in a timely professional manner."  CP at 94.

---

[11] Again, citing *Larson*, Dale asserts that a court "should not consider an award of fees this size absent a specific and itemized log showing exactly what was done, and how long it took to complete the project.  Further, the personal representative must show that the work was necessary." Br. of Appellant at 18.  *Larson* does not purport to apply to nonlawyer PRs nor does Dale refer us to any authority that requires that lawyer and nonlawyer PRs be treated identically.

Dale further contends that Richard never established that it was necessary for him to spend any time "managing professionals." Br. of Appellant at 18. But Pogorelc stated that Richard provided significant services that the estate would have otherwise had to pay others to provide and there is no reason to conclude that part of those services did not consist of monitoring the logging project and coordinating the activities of other professionals involved.

Dale also asserts that Pogorelc's affidavit was not sufficient to support Richard's claim for professional fees because it "is filled with conclusions, and lacks any specifics that would allow the Court to consider" when determining whether Richard was entitled to those fees. Br. of Appellant at 18. But Dale cites no authority requiring additional detail in this context. And as noted above, Dale did not present any contradictory affidavits or other evidence.

Citing *Larson*, Dale argues that to establish the reasonableness of fees claimed by a PR, the trial court should base the fees on the hours worked multiplied by an hourly rate and establish "that the hours spent were necessary in processing the estate." Br. of Appellant at 17. Apart from the requirement that the PR's activities be necessary, RCW 11.48.050, we disagree. *Larson* addresses a fee request by an attorney for both legal and nonlegal services to an estate and was specific to probate attorneys. 103 Wn.2d at 531. Richard is not an attorney.

Dale also argues that in setting the fees, the trial court must consider "'the amount and nature of the services rendered, the time required in performing them, the diligence with which they have been executed, the value of the estate, the novelty and difficulty of the legal questions involved, the skill and training required in handling them, the good faith in which the various legal steps in connection with the administration were taken, and all other matters which would aid the court in arriving at a fair and just allowance.'" Br. of Appellant at 14 (quoting *In re Merlino's*

16

*Estate*, 48 Wn.2d 494, 498, 294 P.2d 941 (1956)). But as with *Larson*, *Merlino's Estate* addresses attorney fees not PR fees.

Dale contends that although these standards apply to attorneys, they should also apply to PRs. But Dale cites no legal authority to support this assertion. Nor, given the considerations discussed in *Fetterman's Estate* regarding the difficulties inherent in fully tracking and monitoring the exact activities of a PR, does Dale persuade us that this standard, rather than the standards established under *Fetterman's Estate* and RCW 11.48.050, should apply to nonprofessional PRs. *See Fetterman's Estate*, 183 Wash. at 413. We note as a policy matter that placing too onerous a burden on nonprofessionals who agree to act as PRs could potentially dissuade private individuals from taking on such duties.

In sum, Pogorelc's affidavit allows us to conclude that the trial court did not abuse its discretion when it awarded Richard $30,000 in professional fees for his forestry management services.

3.    PR FEES AWARD

Dale next argues that the trial court erred in granting Richard $30,000 in PR fees because there was no support for this request. Dale asserts that the documentation that Richard provided was insufficient to justify the award because it lacked detail and that Richard's assertion that the estate was complex was merely a conclusory statement not supported by any evidence. Dale fails to demonstrate an abuse of discretion.

Although Richard's documentation of his work on behalf of the estate was minimal, he also presented Alexander's affidavit opining that Richard's fee request was far below what it would have cost to have a professional PR manage the estate. Additionally, there was evidence in

the record that representing this estate was not a simple process. The two settlement agreements, the record as a whole, and Pogorelc's affidavit all supported Richard's assertion that the estate was complicated by difficulty among the family members. Furthermore, Elma's will evidenced the fact that there were some tax complexities. The tax issues and the necessity of engaging in timber sales alone would allow the trial court to find that this estate was more complicated than the average estate.

Ultimately, given the length of time it took to administer this estate,[12] the $30,000 compensation for administering the estate amount to approximately $1,430 per year. Not only was Richard handling ordinary executor's duties, he also had to address tax issues, family issues, property issues, and specialized issues having to do with timber harvests. In contrast, based on the record before us, Dale did not present anything but argument and his attorney's assertions that these fees were excessive or unnecessary. Under these circumstances, we hold that Dale has failed to demonstrate that the trial court abused its discretion when it awarded Richard $30,000 (approximately $1,430 per year) for his administration of the estate.[13]

---

[12] We acknowledge that Dale also argues that the 21-year time frame was unreasonable and largely caused by Richard himself. But because of the February 2009 settlement agreement, we must assume that Richard's activities until that time were reasonable.

As to the years following February 2009, Richard presented evidence that the delay was largely because he was waiting for the timber market to recover and, to some extent, difficulty obtaining the timber permits due to issues with Tammi. By waiting, the value of the timber increased, and Richard successfully sold the timber for a substantially higher price and benefitted the estate. Furthermore, Dale presents no evidence supporting that Richard was the cause of any undue delay. Accordingly, Dale does not persuade us that the time it took Richard to close the estate after 2009 was unreasonable.

[13] We note that even in 1922, an annual fee of $1,500 to manage a $100,000 estate, when the management of the estate required extra duties and the executor's services benefitted the estate, was considered reasonable. *In re Snyder's Estate*, 122 Wash. 65, 66-68, 209 P. 1074 (1922).

### E.  NO "FACTUAL HEARING"

Finally, Dale appears to argue that because the supporting information Richard provided in support of his fee requests was vague, the trial court needed to fill in gaps and that this required a factual hearing that was not held.  The record is not sufficient for us to evaluate this claim.  Because the record does not contain the transcripts of any of the proceedings, we cannot determine if there was or was not a "factual hearing" at which Dale was given the opportunity to present his own evidence or whether Dale requested such a hearing.  Because the record is inadequate, we do not address this issue further.  *Stevens County v. Loon Lake Prop. Owners Ass'n*, 146 Wn. App. 124, 131, 187 P.3d 846 (2008) (party seeking appellate review has the burden of providing an adequate record for review; the trial court's decision stands if the appellant fails to meet this).

### III.  ATTORNEY FEES DENIED ON APPEAL

Finally, Richard requests fees and costs on appeal under RCW 11.96A.150(1) and RAP 18.9(a).  We may grant an award of reasonable attorney fees on appeal to a party that requests it in its brief, as long as applicable law provides for such an award.  RAP 18.1.  RCW 11.96A.150(1) provides that it is within this court's discretion to award reasonable attorney fees and to direct that the award be paid by any party to the proceeding or the assets of the estate.  RCW 11.96A.150(1).  RAP 18.9(a) allows us to award attorney fees and costs as sanctions for a frivolous appeal.  *Yurtis v. Phipps*, 143 Wn. App. 680, 696, 181 P.3d 849 (2008).

"An appeal is frivolous if, considering the entire record, the court is convinced that the appeal presents no debatable issues upon which reasonable minds might differ and that it is so devoid of merit that there is no possibility of reversal."  *Lutz Tile, Inc. v. Krech*, 136 Wn. App. 899, 906, 151 P.3d 219 (2007).  Here, Dale's arguments are not so totally devoid of merit to be

deemed frivolous. We further exercise our discretion and decline to award fees and costs from John's portion of the estate.

Accordingly, we affirm the trial court's award of PR and professional fees to Richard.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, A.C.J.

MELNICK, J.